# UNITED STATES DISTRICT COURT
## FOR DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
|   By the United States Attorney for | : | |
|     the District of Columbia | : | |
|     555 4th Street, NW | : | |
|     Washington, DC 20530 | : | |
| | : | |
|         *Plaintiff,* | : | |
| | : | |
|         v. | : | Civil Action No.: 17-1950 |
| | : | |
| J&G TREJO ENTERPRISES, INC., | : | JURY TRIAL DEMANDED |
| d/b/a Best Medical Supply | : | |
| 104 S. Broadway | : | |
| McAllen, TX 78501 | : | |
| | : | |
| JOSE LUIS TREJO | : | |
| Co-owner/President of J&G Trejo Enterprises, Inc. | : | |
| d/b/a Best Medical Supply | : | |
| 104 S. Broadway | : | |
| McAllen, TX 78501 | : | |
| | : | |
| GABRIELA TREJO | : | |
| Co-owner/Vice-President J&G Trejo | : | |
| Enterprises, Inc., | : | |
| d/b/a Best Medical Supply | : | |
| 104 S. Broadway | : | |
| McAllen, TX 78501 | : | |
| | : | |
| INMOBILIARIA CORPUS CHRISTI, S.A de C.V. | : | |
| Pereyra No. 404 Oriente, Zona Centro | : | |
| Durango, Durango C.P. 34000 | : | |
| Mexico | : | |
| | : | |
| JOSE RAMON ENRIQUEZ HERRERA | : | |
| Salvador Nava Rodriguez #400 A OTE | : | |
| Zona Centro, Durango | : | |
| Durango C.P. 34000 | : | |
| Mexico | : | |

FELIPE DE JESUS ENRIQUEZ HERRERA          :
Laureano Roncal #401 Norte                :
Norte Zona Centro, Durango                :
Durango C.P. 34000                        :
Mexico                                    :
                                          :
JESUS CARLOS GUTIERREZ ENRIQUEZ           :
5721 Santa Ana St., Ste B                 :
Ontario, CA 91761                         :
                                          :
ANA MARIA HERRERA RUIZ                     :
Laureano Roncal #401 Norte                :
Norte Zona Centro, Durango                :
Durango C.P. 34000                        :
Mexico                                    :
                                          :
                                          :
        *Defendants*.                     :

## COMPLAINT

Now comes the Plaintiff United States of America, by and through undersigned counsel, and respectfully states as follows:

1.      This is an action brought by Plaintiff United States of America against Defendants for treble damages, actual damages, and other equitable relief pursuant to the False Claims Act, as amended, 31 U.S.C. §§ 3729 *et seq*.  The False Claims Act provides that any person who knowingly submits a false or fraudulent claim to the United States Government for payment or approval is liable for a civil penalty of not less than $5,500 and more than $11, 000 for each false claim, plus three times the amount of damages sustained by the government for each claim. *See* 31 U.S. C. § 3729(a); 28 C. F. R. § 85. 3.

2.      As is more fully set forth below, Defendants acted individually and in cooperation with one another and others to defraud the United States of America in violation of

2

the False Claims Act, 31 U. S. C. §§ 3729-32, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986). Defendants individually and collectively knowingly submitted, caused to be submitted, and/or facilitated the submission of false and fraudulent documents and testimony to the federal government. Defendants knowingly submitted and/or aided in the submission of bills, invoices, checks, records statements, other documents and testimony to government agencies knowing full well that they were false. Consequently, Defendants are liable under the False Claims Act for payments they received.

3.      Plaintiff seeks $9,649,758.39 in damages and a civil penalty of between $5,000 and $11,000 for each false claim.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to  31 U.S.C. §§ 3730 and 3732, and 28 U.S.C. §§ 1331, 1345 and 3101.

5.      This Court has jurisdiction by virtue of 31 U.S.C. § 3732 because Defendants' acts or omissions were directed at or affected Export and Import Bank of the United States ("Ex-Im Bank") and because the alleged injuries arose out of or relate to Defendants' acts or omissions.

6.      Venue is proper in this District by virtue of 31 U.S.C. § 3732, because Defendants' acts or omissions were directed at or affected Ex-Im Bank, which is found in this District, and because the alleged injuries occurred in this District and arose out of or relate to Defendants' acts or omissions.

## <u>Introduction</u>

7.      The Export-Import Bank of the United States ("Ex-Im Bank") is an independent agency

of the executive branch of the United States Government and is located at 811 Vermont Avenue N.W.,

Washington, DC, 20571.  It is the official export credit agency of the United States for purposes of

international agreements.  Ex-Im Bank's mission is to support U.S. jobs by supporting financing for the

export of United States goods and services to companies overseas.  One of the ways Ex-Im Bank fulfills

this mission is by issuing loan guarantees or loan insurance policies to financial institutions that are

making "medium term" loans to foreign companies for the purpose of purchasing goods or services

exported from the United States.  Sometimes Ex-Im Bank also issues a loan insurance policy directly to

an exporter that is itself extending credit for the purchase of goods or services.  A "medium term" loan

is a loan, usually for the purchase of some kind of capital goods and/or related services, and usually

having a repayment term of no more than 7 years.

       8.     Pursuant to an agreement known as "the Arrangement" under the auspices of the

Organization for Economic Cooperation and Development (the "OECD"), Ex-Im Bank can only finance

up to a maximum of 85% of the contract price of goods or services.  The remaining 15% must either be

paid in cash by the buyer, or it can be financed by the exporter, the lender, or another third party.  In the

cases where the exporter or another party finances the "15%", such financing should be documented

with appropriate loan documentation, just like any other loan.  In addition, Ex-Im Bank's guarantee and

insurance products are only to be used to support the sales of U.S. goods and services.  Conversely,

such products are not to be used for the purpose of extending cash loans to foreign buyers, as this does

not further Ex-Im Bank's mission of supporting U.S. based jobs.

       9.     Ex-Im Bank's medium term loan guarantees and loan insurance policies both provide

similar coverage to the financial institution making the loan to the foreign-based buyer.  If the foreign-

based buyer defaults on its loan obligations, the financial institution can file a claim with Ex-Im Bank.

Provided all the appropriate conditions have been met, Ex-Im Bank will pay the financial institution claim, take an assignment of the foreign buyer's loan obligations, and pursue collection against the foreign-based buyer.  The Ex-Im Bank relies upon a number of documents in evaluating whether to extend its guarantee to a loan, including the application or certification prepared for the Ex-Im Bank by or on behalf of the exporter and/or the  foreign borrower, and all relevant contractual agreements, such as those executed by the borrower and exporter.

10.     In connection with both its medium term guarantees and insurance policies, Ex-Im Bank requires that a United States exporter – the person or entity selling the goods or services to the foreign buyer – execute a prescribed form whereby the exporter certifies to the financial institution and Ex-Im Bank, the type, amount, and value of the United States goods or services that it has shipped or will be shipping (or, in the case of services, that it has delivered or will deliver) to its foreign buyer.  In addition, the exporter must also certify either that the goods were 100% made in the United States, or the exporter must indicate by percentage the portion of the goods (on an aggregate value basis) that was or were made in the United States.

11.     If an insured or guaranteed loan defaults then the financial institution must file a claim with Ex-Im Bank in order to collect the promised coverage.

(a)  If the claim relates to an Ex-Im Bank insurance policy, then the insured financial institution must submit several documents to Ex-Im Bank.  These documents are normally submitted by e-mail or other transmission utilizing the means of interstate wire communications and also by United States mail.  The required documents include an Ex-Im Claim Form, copies of the relevant invoices and bills of lading (or other shipping documents), the promissory note(s) signed by the foreign buyer, and the Ex-Im Bank

5

form of Exporter's Certificate signed by the U.S. exporter.

(b)  If the claim relates to the Ex-Im Bank guarantee program, as is the case here, then the foregoing documents are not required to be submitted with the claim itself, but must be available upon demand by Ex-Im Bank, at which time they are normally provided to Ex-Im Bank by either interstate wire or the United States mail.

12.     Ex-Im Bank pays most of its claims via wire transfers.  All of the wire transfers are originated at Ex-Im Bank, 811 Vermont Ave, N.W., Washington, DC, by members of the Chief Financial Officer's staff by entering the payment into the Secure Payment System (SPS).  An Ex-Im Bank certifying official reviews the wire transfer's validity and then approves the wire in the SPS.  The request to send a wire transfer is then sent electronically from Ex-Im Bank to the Federal Reserve.

## THE PARTIES

### Plaintiff

13     Plaintiff is the United States of America.

### Defendants

14.     J & G Trejo Enterprises, Inc., d.b.a. **BEST MEDICAL SUPPLY** ("BMS"), a seller of new and used medical equipment, primarily to customers in Mexico.  BMS is located in McAllen, Texas.

15.     **JOSE LUIS TREJO** ("TREJO") - a U.S. citizen, residing in Texas, and co-owner of J & G Trejo Enterprises, Inc., d.b.a. **BEST MEDICAL SUPPLY** ("BMS"), a seller of new and used medical equipment, primarily to customers in Mexico.  TREJO is also President, Secretary, and Registered Agent of BMS.

16.     **GABRIELA TREJO** ("GABRIELA") - a U.S. citizen, residing in Texas, and co-owner

6

of J & G Trejo Enterprises, Inc., d.b.a. **BEST MEDICAL SUPPLY** ("BMS"), a seller of new and used medical equipment, primarily to customers in Mexico.  GABRIELA is Vice-President and Manager of BMS.  There are no other owners or executives of BMS.

17     **INMOBILIARIA CORPUS CHRISTI, S.A de C.V.**  ("ICC"), which ICC is a proposed hospital complex that was under construction in Durango, Mexico, during the time period described in this Complaint.

18.     **JOSE RAMON ENRIQUEZ HERRERA** ("ENRIQUEZ") - a Mexican National, residing in Durango, Mexico, and part owner and General Manager of ICC.

19.     **FELIPE DE JESUS ENRIQUEZ HERRERA** ("FELIPE ENRIQUEZ") - a Mexican National residing in Durango, Mexico, and part owner and Director General of ICC.

20.     **JESUS CARLOS GUTIERREZ ENRIQUEZ** ("GUTIERREZ") – a U.S. citizen residing in California, and owner of CTA Fixtures Inc. ("CTA Fixtures").  GUTIERREZ is also part owner of ICC and a relative of ENRIQUEZ.

21.     **ANA MARIA HERRERA RUIZ** ("RUIZ") -  a Mexican National residing in Durango, Mexico, and part owner of ICC.

## OTHER RELEVANT PARTIES

22.     **ARIANA PERLES BLANCO** ("PERLES") – a Mexican National residing in Texas, and employee of BMS and **WORLDWIDE IMPORTS, S.A. de C.V.** ("WWI").  WWI is a freight forwarding company registered in Reynosa, Mexico, but owned by TREJO and operated out of BMS in McAllen, Texas.

23. **NORTHSTAR TRADE FINANCE** ("NORTHSTAR") – a Canadian financial institution and the guaranteed lender in the BMS – ICC transaction.

## BACKGROUND

24.     In or about February 2009, TREJO created a *pro forma* invoice for the sale of $4.9 Million worth of medical equipment from BMS to "Dr. Jose Ramon Enriquez, Inmobiliaria Corpus Christi, S.A. de C.V."

25.     On or about April 29, 2009, TREJO signed an Ex-Im Bank Form of Exporter's Certificate stating his intent, through BMS, to export $4.9 Million worth of medical equipment to ICC under Ex-Im Bank Guarantee number 457394.  On the form, TREJO certified that he would receive payment for at least 15% of the Net Contract Price, and/or that he would finance such amount at market rates. He certified that he would submit evidence of payment of invoices to the lender and/or Ex-Im Bank.  TREJO further certified he would provide copies of invoices describing the Goods and Services and signed, clean, onboard bills of lading evidencing that the Goods included in the Net Contract Price had been shipped from the U.S. to the Purchaser's country.

26.  TREJO acknowledged that Ex-Im Bank would rely on the certifications and representations made in the Exporter's Certificate, and agreed to be liable for any damages suffered by Ex-Im Bank's reliance.  He acknowledged that the certifications were subject to the penalties for fraud provided in Article 18 U.S.C., Section 1001. He agreed that presentation of invoices for payment under the Ex-Im Bank Guarantee was a confirmation of the information and certifications he had made.

27.     In June 2009, NORTHSTAR applied for an Ex-Im Bank Guarantee on a proposed loan from NORTHSTAR to ICC for the purchase of up to $4.9 million in medical equipment from BMS. The loan was authorized for 85% of the purchase price, plus fees.

28.     On September 4, 2009, the Ex-Im Bank issued Guarantee became effective with the issuance of an Operative Notice to NORTHSTAR for the approved credit to ICC.   This notice allowed

8

disbursements to be made by NORTHSTAR for the transaction.

29.     On September 8, 2009, TREJO transferred $130,000, by wire, from a Lone Star Bank account to a Bank of America account held by CTA Fixtures.  On September 10, 2009, TREJO transferred $260,000, by wire, from the same Lone Star Bank account to the CTA Fixtures Bank of America account.  On September 11, 2009, TREJO transferred $345,000, by wire, between the two accounts.  The aggregate amount of the three wire transfers was $735,000.

30.     Anticipating the wire transfers of money to come from TREJO, on September 8, 2009, GUTIERREZ caused two (2) wire transfers to be made from the CTA Fixtures Bank of America account to a BMS account at Compass Bank.  The wire transfers were for $130,000 and $260,000, respectively.  On September 14, 2009, GUTIERREZ caused a third wire transfer to be made from the CTA Fixtures Bank of America account to the BMS Compass Bank account for $345,000.  The aggregate amount of these transfers was $735,000, which equals 15% of the $4.9 Million transaction amount, the minimum down payment amount mandated by Ex-Im Bank.  TREJO sent this amount to GUTIERREZ, who returned or "round-tripped" the money back to BMS.

31.     In an undated letter to Mark Mischnick of NORTHSTAR, TREJO wrote:

> Attached is the confirmation of the wire transfer of the 15% Down Payment for the transaction of Inmobiliaria Corpus Christi S.A. de C.V.
>
> The wire transfer it's from CTA Fixtures, Inc. for the benefit of Inmobiliaria Corpus Christi S.A. de C.V.
>
> CTA Fixtures, Inc. it's owned by one of the owners of Inmobiliaria Corpus Christi S.A. de C.V.

The purpose of this letter to NORTHSTAR was to certify that ICC had made the required 15%

down payment through CTA Fixtures.  TREJO provided evidence of the second half of the round-trip

payment when, in fact, ICC had made no down payment.

32.      On December 15, 2009, ENRIQUEZ, FELIPE ENRIQUEZ, GUTIERREZ and a

minority owner of ICC, RUIZ, signed a Credit Agreement and Promissory Note to NORTHSTAR for

$4,290,366.00, related to the purchase of medical equipment from BMS.  The ICC owners agreed to

make ten (10) installment payments of approximately $429,000.00, beginning on June 15, 2010, and

continuing on June 15th and December 15th of each year.

33.      On December 21, 2009, TREJO submitted a Confirmation of Disbursement and

Assistance in Collection of Loss to NORTHSTAR.  TREJO's letter stated in part:

> The purpose of this document is to inform NORTHSTAR Trade Finance Inc.
> ("NORTHSTAR") that a shipment by J & G Trejo Enterprises Inc., doing
> business as Best Medical Supply (the "Exporter") occured [sic] in relation to the
> above-mentioned financing between NORTHSTAR and INMOBILIARIA
> CORPUS CHRISTI, S.A. DE C.V. (the "Borrower").  Please acknowledge the
> bank account information to where the payment to the Exporter should be made:
>
> Total Contract Amount as per Pro forma Invoices No. 2301 dated 11/20/2009,
> 2303 dated 12/1/2009, 2305 dated 12/11/2209 [sic], 2306 dated 12/12/2009 and
> 2307 dated 12/15/2009:  US$4,900,000.00, 85.00% Financed – US
> $4,165,000.00.
>
> Amount to be disbursed upon confirmation by NORTHSTAR that the financing
> is operational and upon presentation of the Exporter of evidence of shipment:
> US $4,165,000.00 (the "Funds").

The letter went on to direct NORTHSTAR to deposit the $4,165,000.00, which is

85% of the full $4.9 Million transaction amount, in the same Compass Bank account to which

GUTIERREZ had wired the return of the "round-trip" down payment.  The letter also stated that

the Exporter, TREJO, "acknowledges it has received from the Borrower a down payment of US

$735,000.00 equivalent to 15.00% of the Contract Amount."

34.      Attached to the above form were five (5) BMS invoices for medical equipment sold to "Dr. Jose Ramon Enriquez, Inmobiliaria Corpus Christi, S.A. De C.V." in Durango, Mexico.  Also attached were five (5) matching packing slips displaying a logo for Worldwide Imports, S.A. de C.V. These packing slips were submitted to NORTHSTAR as evidence that the export of all $4.9 Million in medical equipment had occurred.

35.      On that same day, December 21, 2009, HERRERA and FILIPE ENRIQUEZ sent a letter to NORTHSTAR, referencing the Ex-Im Bank loan guarantee, and requested the disbursement of $4,165,000.00 to BMS. The letter certified that ICC made the 15% down payment and that the products were shipped to ICC.

36.      On February 4, 2010, NORTHSTAR officers directed the Bank of Montreal to wire $4,165,000 to BMS.  On February 9, 2010, Bank of Montreal wired $4,164,975.00 to the BMS Compass Bank account.

37.      On May 3, 2010, TREJO deposited $850,000 from a personal Compass Bank Account into an escrow account held by the law firm Salinas & Legere P.C.  On June 15, 2010, $500,000 was sent by wire transfer from the Salinas & Legere escrow account to the CTA Fixtures Bank of America account.

38.      On June 16, 2010, GUTIERREZ transferred $501,539.72 from CTA Fixtures' Bank of America account to NORTHSTAR to make the first installment payment on the loan to ICC.

39.      On January 14, 2011, approximately one month after the second installment payment from ICC to NORTHSTAR was due, GUTIERREZ wrote a letter to NORTHSTAR Loan Administration Officer Juan Gonzalez.  The letter stated:

As per our conversation we had earlier this week, on behalf of Inmobiliaria Corpus Christi, I am requesting that Northstar allows Inmobiliaria to bring the payment up to date until January 26, 2011.

We are facing some situations with Best Medical Supply, I can state that, as of today we have not received a single medical equipment in Durango.

We are working with our provider with all the good intentions on finding a solution to this problem.

40.    On January 17, 2011, Mark Mischnick of NORTHSTAR forwarded GUTIERREZ' letter to TREJO via email.  On the same date, TREJO forwarded that same email to BMS employee Rene Serna.  In the email, TREJO wrote in part, "call dr enriquezn [sic] and tell him to expect all hsi [sic] fuckin [sic] equipment in the next 10 days!! do not copy this letter to any body [sic]."

41.    On January 21, 2011, ENRIQUEZ sent a second letter to Juan Gonzalez of NORTHSTAR.  The letter stated:

The reason of this letter, it's to apologize for the letter that our partner Jesus Carlos Gutierrez Enriquez wrote on January 14, 2011; because it was originated based on misunderstood information between us, and for the difficulties we were having at that time.

It's very important to state that we do not have any kind of problems or difficulties with our supplier Best Medical Supply.

I really appreciate if you would disregard the letter you received before on January 14, 2011.

42.    On January 26, 2011, TREJO wire transferred $329,000 from a BMS account at San Antonio Bank to the CTA Fixtures Bank of America account.  On January 28, 2011, TREJO made two wire transfers from a personal Compass Bank account to the CTA Fixtures Bank of America account for $70,000 and $130,000, respectively.

12

43.     On January 27, 2011, GUTIERREZ wire transferred $329,000 from the CTA Fixtures Bank of America account to NORTHSTAR.  On January 28, 2011, GUTIERREZ wire transferred $130,000 from the same account to NORTHSTAR.  Finally, on January 31, 2011, GUTIERREZ wire transferred $69,866.28 from the CTA Fixtures account to NORTHSTAR.  The total amount paid to Northstar in January 2011 was $528,866.28, inclusive of interests and fees.

44.     The June 15, 2011 loan payment was not paid to NORTHSTAR by ICC, TREJO, or GUTIERREZ.  NORTHSTAR attempted to collect the payment with negative results.  On September 27, 2011, NORTHSTAR filed a claim with Ex-Im Bank under the loan Guarantee.

45.     In October 2011, Ex-Im Bank sent demands to the ICC guarantors, ENRIQUEZ, FELIPE ENRIQUEZ, GUTIERREZ and RUIZ.  On November 2, 2011, when no payment was received, Ex-Im Bank caused a wire transfer of $3,216,586.13 to be sent from the United States Treasury to the Bank of Montreal to satisfy the conditions of the Guarantee.

46.     On December 2, 2011, Ex-Im Office of Inspector General ("OIG") issued a subpoena to BMS for records associated with the ICC transaction.  BMS responded to the subpoena and provided two Mexico Customs Pedimento forms as evidence of export to Mexico.  The first Pedimento was dated December 11, 2009, and corresponded to BMS invoice number 2304.  The corresponding invoice was not provided by BMS in response to the subpoena.  The second Pedimento was dated February 2, 2010, and corresponded to BMS invoice number 2313.  This invoice was also not provided in response to the subpoena.  The dates, invoice numbers, and equipment listed on the two Pedimentos did not correspond with the certifications TREJO made in his December 21, 2009 disbursement request to NORTHSTAR (Paragraph 33, above).

47.     On September 26, 2012, ENRIQUEZ was interviewed by Ex-Im Bank OIG. ENRIQUEZ acknowledged entering into an agreement with TREJO and BMS to purchase medical equipment.  He acknowledged signing the Promissory Note to NORTHSTAR.  ENRIQUEZ acknowledged not making any payments on the NORTHSTAR loan.  He said he did not make the payments because he did not receive the equipment from BMS that he had agreed to purchase. ENRIQUEZ said ICC received two shipments that consisted of 37 items.  He said the total order was for 844 items.  Of the 37 items, he said the majority were mattresses, and he described the other equipment as old and damaged.

48.     On April 2, 2015, BMS and WWI employee PERLES was interviewed by Ex-Im Bank OIG Special Agents.  PERLES was shown the five (5) WWI packing slips submitted to NORTHSTAR by TREJO as evidence of the alleged five (5) shipments to ICC containing $4.9 Million worth of medical equipment. She was asked whether the packing slips looked familiar to her.  PERLES said she recognized the WWI logo on the packing slips, but had never seen packing slips in this format before. PERLES explained that packing slips she received from BMS were handwritten, and provided two different packing slips for shipments to ICC along with corresponding Pedimento forms.  The packing slips PERLES provided were dated December 10, 2009, and January 28, 2010, respectively.  The corresponding Pedimentos, dated December 11, 2009 and February 2, 2010, matched the two Pedimentos provided by TREJO under the Ex-Im Bank OIG subpoena.  PERLES said these were the only records she had of shipments from BMS to ICC.  PERLES said in her capacity at BMS and WWI, she was not aware of any additional shipments of equipment from BMS to ICC.

49.     During the PERLES interview, she was asked to compare the equipment listed on the two (2) Pedimento forms to the equipment listed on the five (5) BMS invoices submitted to

14

NORTHSTAR by TREJO with the BMS disbursement request.  PERLES counted 37 items from the Pedimentos that also appeared on the invoices.  Using the value of the medical equipment listed on the invoices for the 37 items, the total value of the two (2), and only known, shipments to ICC from BMS was approximately $1.3 Million.

50.     On April 9, 2015, Craig MacKenzie, Managing Director of NORTHSTAR was interviewed by Ex-Im Bank OIG Special Agents.  MacKenzie said he was not aware that BMS had covered the 15% down payment for ICC through the "round-trip" wire transfers. MacKenzie said the deal would have been "ineligible" for financing if NORTHSTAR knew ICC did not make its own down payment as required.  MacKenzie said NORTHSTAR would not have disbursed the full loan amount to BMS if they believed the full $4.9 million worth of equipment had not been shipped as TREJO had certified.  He said the money was disbursed with the understanding that BMS had exported all of the goods.  MacKenzie also said NORTHSTAR was not notified or aware that TREJO owned WWI.

51.     On February 25, 2015, Rene Serna, a former employee of BMS, was interviewed by Ex-Im Bank OIG Special Agents.  Serna said he recalled the BMS–ICC transaction.  Serna said employees of BMS, including himself, usually packaged medical equipment at the BMS facility before it was shipped to Mexico.  Serna was shown the five (5) invoices submitted by TREJO to NORTHSTAR that accompanied BMS' disbursement request.  The invoices contained approximately 848 items that were allegedly packed, according to WWI packing slips, between November 23, 2009 and December 18, 2009.  Serna was asked whether he recalled packing that much equipment during that time period.  He said he did not recall that much equipment, but could not recall exactly what was packed or shipped.

15

52.     During the February 25, 2015 interview, Serna offered to provide Ex-Im Bank

OIG Special Agents with e-mail messages regarding the BMS–ICC transaction from his

personal email account, rserna18@hotmail.com.  Among the emails forwarded from Serna, was

a November 23, 2009 email from TREJO using the email address joetbms@aol.com.  Attached

to that email was an undated WWI packing slip with no corresponding invoice number.  The

"Ship To" information was, "Dr. Jose Ramon Enriquez, Inmoboliaria Corpus Christi, S.A. de

C.V."  The items and descriptions listed on the packing slip were identical to items listed on the

packing slip corresponding to invoice number 2301 submitted to NORTHSTAR with TREJO's

disbursement request.  In the document properties, the author of the packing slip was listed as

"Joe Trejo."  The document was created on November 23, 2009, and last saved on the same date

by "Joe Trejo."

## COUNT ONE
### (False Claims Against All Defendants)
### 31 U.S.C. § 3729(a)(1)

53.     Plaintiff incorporates by reference the allegations set forth in Paragraphs 1

through 52 as if fully set forth herein.

54.     Among the manner and means by which Defendants carried out the scheme were

the following:

          a.     Defendants sought to have a $4,165,000 loan to ICC for the

purchase of medical equipment from BMS guaranteed or insured by Ex-Im Bank in order to

facilitate the fraudulent loan transaction;

b.      Defendants knowingly and intentionally, acting in concert and together, prepared, or caused to be prepared, false certifications to NORTHSTAR and Ex-Im Bank, stating that BMS had received a 15% down payment of the transaction amount from ICC;

c.      Defendants did not make or receive a 15% down payment from ICC to BMS, but caused $735,000 to be "round-tripped" from bank accounts in TREJO's control to a bank account in GUTIERREZ'S control, and the money was returned back to a BMS bank account.  Defendants knowingly and intentionally submitted false certifications that ICC had made the required down payment;

d.      Defendants prepared, or caused to be prepared, false certifications to NORTHSTAR and Ex-Im Bank, stating that BMS had completed five (5) exports of medical equipment to ICC.  At the time, BMS had made one (1) export to ICC containing far less than the 848 items and $4.9 Million worth of equipment under contract;

e.      Defendants prepared, or caused to be prepared, false invoices and packing slips submitted to NORTHSTAR and Ex-Im Bank in support of exports that Defendants knew had not occurred;

f.      In total, BMS exported approximately 37 of the 848 items listed on BMS invoices, at a value of approximately $1.3 Million;

g.      The false documents knowingly submitted by Defendants caused NORTHSTAR to disburse to BMS $4,164,975 as payment for goods Defendants knew had not been delivered to ICC;

17

h.      In June 2010 and January 2011, Defendants caused payments to be made from BMS to NORTHSTAR through CTA Fixtures to keep the NORTHSTAR loan to ICC from going into default;

i.      At the time of the January 2011 payment, TREJO directed a subordinate to tell ENRIQUEZ to expect all of his equipment, an acknowledgement that the contracted equipment had not been shipped to ICC;

j.      When Defendants ceased to make payments to NORTHSTAR to maintain the ICC loan for goods that were not delivered, NORTHSTAR filed a claim with Ex-Im Bank under the Ex-Im Bank Guarantee No. 457394 for $3,216,586.13, which was paid by the United States Treasury.

55.     By virtue of the acts set forth above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims, to the United States for payment or approval, in violation of 31 U.S.C. § 3729(a)(1); the purpose and objective of the scheme was for Defendants to unlawfully enrich themselves by submitting false or fraudulent claims, certifications or information directly to Ex-Im Bank or to Ex-Im Bank through NORTHSTAR, in order to obtain a disbursal of loan funds guaranteed by Ex-Im Bank, in association with a transaction in which the products were not exported in full, and which Defendants certified had been exported in full; that Defendants caused the false or fraudulent claims to be approved and paid by the United States, in violation of 31 U.S.C. § 3729(a)(1); that the United States has currently incurred damages of at least $3,216,586.13 plus interest; and that the United States is entitled to three times the amount by which it is damaged, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented.

## COUNT TWO
### (False Record, Statement Material to a False or Fraudulent Claim, Certification Against All Defendants)
### 31 U.S.C. § 3729(a)(1)(B)

56.    Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 55 as if fully set forth herein.

57.    Among the manner and means by which Defendants carried out the scheme were the following:

a.    Defendants sought to have a $4,165,000 loan to ICC for the purchase of medical equipment from BMS guaranteed or insured by Ex-Im Bank in order to facilitate the fraudulent loan transaction;

b.    Defendants knowingly and intentionally, acting in concert and together, prepared, or caused to be prepared, false certifications to NORTHSTAR and Ex-Im Bank, stating that BMS had received a 15% down payment of the transaction amount from ICC;

c.    Defendants did not make or receive a 15% down payment from ICC to BMS, but caused $735,000 to be "round-tripped" from bank accounts in TREJO's control to a bank account in GUTIERREZ'S control, and the money was returned back to a BMS bank account.  Defendants knowingly and intentionally submitted false certifications that ICC had made the required down payment;

d.    Defendants prepared, or caused to be prepared, false certifications to NORTHSTAR and Ex-Im Bank, stating that BMS had completed five (5) exports of medical equipment to ICC.  At the time, BMS had made one (1) export to ICC containing far less than the 848 items and $4.9 Million worth of equipment under contract;

e.      Defendants prepared, or caused to be prepared, false invoices and packing slips submitted to NORTHSTAR and Ex-Im Bank in support of exports that Defendants knew had not occurred;

f.      In total, BMS exported approximately 37 of the 848 items listed on BMS invoices, at a value of approximately $1.3 Million;

g.      The false documents knowingly submitted by Defendants caused NORTHSTAR to disburse to BMS $4,164,975 as payment for goods Defendants knew had not been delivered to ICC;

h.      In June 2010 and January 2011, Defendants caused payments to be made from BMS to NORTHSTAR through CTA Fixtures to keep the NORTHSTAR loan to ICC from going into default;

i.      At the time of the January 2011 payment, TREJO directed a subordinate to tell ENRIQUEZ to expect all of his equipment, an acknowledgement that the contracted equipment had not been shipped to ICC;

j.      When Defendants ceased to make payments to NORTHSTAR to maintain the ICC loan for goods that were not delivered, NORTHSTAR filed a claim with Ex-Im Bank under the Ex-Im Bank Guarantee No. 457394 for $3,216,586.13, which was paid by the United States Treasury.

58.      By virtue of the acts set forth above, Defendants knowingly presented, or caused to be presented, false or fraudulent certifications to the United States, in violation of 31 U.S.C. §3729(a)(1); the purpose and objective of the scheme was for Defendants to unlawfully enrich themselves by submitting false claims and/or fraudulent certification or information to Ex-Im

Bank through NORTHSTAR, in order to obtain a disbursal of loan funds guaranteed or insured by Ex-Im Bank, in association with a transaction in which Defendants did not fully deliver the products which Defendants were contracted to export, and which Defendants certified had been exported; that Defendants caused the false or fraudulent claims to be approved and paid by the United States; that the United States has currently incurred damages of at least $3,216,586.13 plus interest; and that the United States is entitled to three times the amount by which it is damaged, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented.

### COUNT THREE
### (Conspiracy to Defraud Against All Defendants)
31 U.S.C. § 3729(a)(1)(C)

59.     Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 58 as if fully set forth herein.

60.     Among the manner and means by which Defendants carried out the scheme were the following:

a.     Defendants sought to have a $4,165,000 loan to ICC for the purchase of medical equipment from BMS guaranteed or insured by Ex-Im Bank in order to facilitate the fraudulent loan transaction;

b.     Defendants knowingly and intentionally, acting in concert and together, prepared, or caused to be prepared, false certifications to NORTHSTAR and Ex-Im Bank, stating that BMS had received a 15% down payment of the transaction amount from ICC;

c.     Defendants did not make or receive a 15% down payment from ICC to BMS, but caused $735,000 to be "round-tripped" from bank accounts in TREJO's

21

control to a bank account in GUTIERREZ'S control, and the money was returned back to a BMS bank account.  Defendants knowingly and intentionally submitted false certifications that ICC had made the required down payment;

        d.     Defendants prepared, or caused to be prepared, false certifications to NORTHSTAR and Ex-Im Bank, stating that BMS had completed five (5) exports of medical equipment to ICC.  At the time, BMS had made one (1) export to ICC containing far less than the 848 items and $4.9 Million worth of equipment under contract;

        e.     Defendants prepared, or caused to be prepared, false invoices and packing slips submitted to NORTHSTAR and Ex-Im Bank in support of exports that Defendants knew had not occurred;

        f.     In total, BMS exported approximately 37 of the 848 items listed on BMS invoices, at a value of approximately $1.3 Million;

        g.     The false documents knowingly submitted by Defendants caused NORTHSTAR to disburse to BMS $4,164,975 as payment for goods Defendants knew had not been delivered to ICC;

        h.     In June 2010 and January 2011, Defendants caused payments to be made from BMS to NORTHSTAR through CTA Fixtures to keep the NORTHSTAR loan to ICC from going into default;

        i.     At the time of the January 2011 payment, TREJO directed a subordinate to tell ENRIQUEZ to expect all of his equipment, an acknowledgement that the contracted equipment had not been shipped to ICC;

j.      When Defendants ceased to make payments to NORTHSTAR to maintain the ICC loan for goods that were not delivered, NORTHSTAR filed a claim with Ex-Im Bank under the Ex-Im Bank Guarantee No. 457394 for $3,216,586.13, which was paid by the United States Treasury.

61.      By virtue of the acts set forth above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims, to the United States for payment or approval, in violation of 31 U.S.C. § 3729(a)(1); the purpose and objective of the scheme was for Defendants to unlawfully enrich themselves by submitting false or fraudulent claims, certifications or information directly to Ex-Im Bank or to Ex-Im Bank through NORTHSTAR, in order to obtain a disbursal of loan funds guaranteed by Ex-Im Bank, in association with a transaction in which the products were not exported in full, and which Defendants certified had been exported in full; that Defendants caused the false or fraudulent claims to be approved and paid by the United States, in violation of 31 U.S.C. § 3729(a)(1); that the United States has currently incurred damages of at least $3,216,586.13 plus interest; and that the United States is entitled to three times the amount by which it is damaged, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented.

## COUNT IV
### (Common Law Fraud Against All Defendants)

62.      The United States incorporates by reference the allegations set forth in Paragraphs 1 through 61 as if fully set forth herein.

63.      Defendants falsely represented that ICC paid the 15% down payment and that BMS received the 15% down payment from ICC.

64.      Defendants falsely represented that BMS had shipped the contracted equipment

23

and that ICC received the contracted equipment.

65.     Among the manner and means by which Defendants carried out the fraudulent scheme were the following:

a.     Defendants sought to have a $4,165,000 loan to ICC for the purchase of medical equipment from BMS guaranteed or insured by Ex-Im Bank in order to facilitate the fraudulent loan transaction;

b.     Defendants knowingly and intentionally, acting in concert and together, prepared, or caused to be prepared, false certifications to NORTHSTAR and Ex-Im Bank, stating that BMS had received a 15% down payment of the transaction amount from ICC;

c.     Defendants did not make or receive a 15% down payment from ICC to BMS, but caused $735,000 to be "round-tripped" from bank accounts in TREJO's control to a bank account in GUTIERREZ'S control, and the money was returned back to a BMS bank account.  Defendants knowingly and intentionally submitted false certifications that ICC had made the required down payment;

d.     Defendants prepared, or caused to be prepared, false certifications to NORTHSTAR and Ex-Im Bank, stating that BMS had completed five (5) exports of medical equipment to ICC.  At the time, BMS had made one (1) export to ICC containing far less than the 848 items and $4.9 Million worth of equipment under contract;

e.     Defendants prepared, or caused to be prepared, false invoices and packing slips submitted to NORTHSTAR and Ex-Im Bank in support of exports that Defendants knew had not occurred;

24

f.    In total, BMS exported approximately 37 of the 848 items listed on BMS invoices, at a value of approximately $1.3 Million;

g.    The false documents knowingly submitted by Defendants caused NORTHSTAR to disburse to BMS $4,164,975 as payment for goods Defendants knew had not been delivered to ICC;

h.    In June 2010 and January 2011, Defendants caused payments to be made from BMS to NORTHSTAR through CTA Fixtures to keep the NORTHSTAR loan to ICC from going into default;

i.    At the time of the January 2011 payment, TREJO directed a subordinate to tell ENRIQUEZ to expect all of his equipment, an acknowledgement that the contracted equipment had not been shipped to ICC;

j.    When Defendants ceased to make payments to NORTHSTAR to maintain the ICC loan for goods that were not delivered, NORTHSTAR filed a claim with Ex-Im Bank under the Ex-Im Bank Guarantee No. 457394 for $3,216,586.13, which was paid by the United States Treasury.

66.    Defendants' misrepresentations were material.

67.    Defendants knew that NORTHSTAR and Ex-Im Bank would rely, and intended NORTHSTAR and Ex-Im Bank to rely, on these false representations.

68.    Ex-Im Bank justifiably relied upon these false representations and material omissions.

69.    By virtue of Defendants' fraud, the United States suffered damages in the amount of $3,216,586.13, plus interest.

## COUNT V
**(Unjust Enrichment Claim Against Defendant BMS, Jose Luis Trejo, and Gabriela Trejo)**

70.     Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 61 as if fully set forth herein.

71.     The United States paid to Defendants monies and costs, by which these Defendants were unjustly enriched.

72.     The United States is entitled to the return of all payments paid to Defendants and other damages in an amount to be established at trial.

## COUNT VI
**(Breach of Contract Against Defendants ICC, Enriquez, Felipe Enriquez, Gutierez, and Ruiz)**

73.     The United States incorporates by reference the allegations set forth in Paragraphs 1 through 72 as if fully set forth herein.

74.     Defendants ICC, Enriquez, Felipe Enriquez, Gutierez, and Ruiz entered into contracts with NORTHSTAR, under a loan guaranteed by Ex-Im Bank.  The loan agreement and the Promissory Note imposed obligations on Defendants, among other things, to make ten (10) installment payments of approximately $429,000, plus interest, semi-annually, with the first installment beginning on June 15, 2010, and continuing on June 15 and December 15 of each year thereafter.

75.     On June 16, 2010, Defendants made the first installment payment of $501,539.72 to NORTHSTAR.

76.     On January 27, 2011, Defendants made the second installment of $528,866.28 to NORTHSTAR.

77.     Defendants breached their contractual obligations by failing or ceasing to make

26

any additional payments under the terms of the loan agreement, which caused the loan to go into default.

78.     As a result of Defendants' breach of contracts, NORTHSTAR submitted a claim under Ex-Im Bank Guarantee No. 457394 for $3,216,586.13.

79.     On October 21, 2011, Ex-Im Bank, as the owner of the indebtedness, made demand on the owners of ICC and the guarantors of the loan, including Defendants ENRIQUEZ; FELIPE ENRIQUEZ; GUTIERREZ; and RUIZ, without any success.

80.     By virtue of Defendants' breach of contract, the United States has been damaged. Defendants' failure to make loan payments caused the loan to go into default, causing damages in an amount to be determined at trial.

## DAMAGES

81.      As a result of the above false or fraudulent claims for payment; false records, statements or certifications; conspiracy to obtain payment for a false claim; breach of contract, fraud, and unjust enrichment, the United States suffered single damages totaling $3,216,586.13 plus interest.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that the Court enter judgment under Counts I through IV and award to the United States of America the following:

A.     All amounts paid to Defendants, plus interest;

B.     Damages in the amount of three times the amounts paid to Defendants, plus interest

C.     Statutory penalties;

27

D.     All attorneys' fees and costs incurred by the United States of America as a result

of this action;

E.     Any such other relief as this Court may deem just and proper.

Dated: September **22**, 2017                  Respectfully submitted,

CHANNING D. PHILLIPS
D.C. BAR #415793
United States Attorney

DANIEL F. VAN HORN
D.C. BAR #924092
Chief, Civil Division

By:

John C. Truong, D.C. BAR # 465901
Heather Graham-Oliver
Assistants United States Attorney
United States Attorney's Office
 for the District of Columbia
555 Fourth Street, NW
Washington, D.C.  20530
Tel:  (202) 252-2524 (AUSA Truong)
Tel:  (202) 252-2520 (AUSA Graham-Oliver)
Fax: (202) 252-2599
E-mail: John.Truong@usdoj.gov
Counsel for Plaintiff United States of America